THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  JIANGONG LEI,                          CASE NO. C14-0650-JCC

10                          Plaintiff,     ORDER GRANTING DEFENDANT
                                           CITY OF LYNDEN'S MOTION FOR
11          v.                             SUMMARY JUDGMENT

12  CITY OF LYNDEN, *et al.,*

13                          Defendants.

14

15          This matter comes before the Court on Defendant City of Lynden's Motion for Summary

16  Judgment (Dkt. No. 54).  Having thoroughly considered the parties' briefing and the relevant

17  record, the Court finds oral argument unnecessary and hereby GRANTS the Motion for the

18  reasons explained herein.  All claims (Claims A-E in the Amended Complaint) against the City

19  and its various departments are hereby DISMISSED with prejudice.  The City and its various

20  departments are DISMISSED from this case, with prejudice.  Plaintiff's Amended Response

21  (Dkt. No. 83) and its accompanying attachments are STRICKEN for failure to comply with the

22  Local Rules and the Federal Rules of Civil Procedure.

23  **I.      BACKGROUND**

24          This Court's Order re Defendants' Anti-SLAPP Motion (Dkt. No. 63) and Protective

25  Order (Dkt. No. 68) contain a complete exposition of the background of this case.

26          Plaintiff, a Tacoma real estate investor, has brought multiple claims against several public

and private entities located in Lynden, Washington.  Plaintiff's Amended Complaint contains a

state law defamation claim against the Lynden Tribune and its editor (which the Court has by

now dismissed, *see* Dkt. No. 63), "civil rights," "constitutional," and "equal protections" claims

against the municipal government of Lynden, a "Federal Hate Crime and Sabotage" claim

against several unnamed private citizens of Lynden, and an "Interference with Business

Expectancy" claim against Lynden Chamber of Commerce Manager Gary Vis.  (Dkt. No. 51; *see*

*also* Plaintiff's Sur-Reply, Dkt. No. 82.)

      The basis for these claims consists of (1) Plaintiff's allegation that private Lynden

residents gossiped about him and dissuaded prospective tenants from renting space in his Mall

(Amended Complaint, Dkt. No. 51 at 4-5); (2) Plaintiff's allegations that certain acts of low level

vandalism were not sufficiently investigated by the Lynden Police (*id*. at 6-7); (3) Plaintiff's

allegations that the City inspected his property more frequently than other properties (*id*. at 4);

(4) Plaintiff's allegations that the *Lynden Tribune* published a defamatory article reporting: (a)

the decaying state of Plaintiff's Mall; (b) the number of tenants who left due to what the article

cited as Plaintiff's absenteeism, inattentiveness to Mall maintenance, and penchant for suing his

tenants; and (c) Washington State Department of Health shut downs at other properties owned by

Plaintiff[1] (*id*. at 6); and (5) Plaintiff's allegations that the Manager of the Chamber of Commerce,

Gary Vis, interfered with his business expectancies, such as by urging Plaintiff to lower the rents

for local businesses (*id*. at 4).

      Plaintiff summarizes his claims by stating that Lynden writ large has "lynched [him] in

the most primitive and outrageous form of discrimination," (Complaint, Dkt. No. 1 at 1),

explaining that "[i]n this case, the enemies are like terrorists.  Plaintiff doesn't know where they

are and who they are, but they are everywhere repeatedly and relentlessly attacking him in

the dark."  (Plaintiff's Objection to Defendants' Anti-SLAPP Motion, Dkt. No. 24 at 9.)  He

---

[1] *See also* Declaration of Tim Newcomb, Dkt. No. 19, Ex. A.

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 2

posits that Defendants' alleged offenses have been motivated by "senseless hatred" and

discrimination.  (Amended Complaint, Dkt. No. 51 at 1, 7.)  Plaintiff seeks relief from this

"violent community" of Lynden, and its "vigilantes," "prejudice," and "redneck[s]." (Plaintiff's

Objection to Defendants' Anti-SLAPP Motion, Dkt. No. 24 at 7, 9; Declaration of Jiangong Lei,

Dkt. No. 78, Ex. 1 at 2.)

Defendants are of the opinion that this suit is an attempt to affix blame for the poor

investment returns of Lynden's Dutch Village Mall, which Plaintiff Jiangong Lei purchased on

December 29th, 2006 for $1.23 million dollars.  (Defendants' Answer to Complaint, Dkt. No. 22

at 2.)  Defendants allege that Plaintiff did not maintain the Mall, which fell into disrepair during

his ownership.  Defendants further allege that Plaintiff was "unreasonable" and "difficult" with

his tenants, causing the property to decline.  Plaintiff sold the Mall at a loss in 2013.  Defendants

explain that Plaintiff has a long "documented history of using litigation and the threat of

litigation to intimidate and harass others."  (Motion for Protective Order, Dkt. No. 48 at 2.)

Plaintiff's only cognizable claims against the City are the constitutionally based Claims A

and B of his Amended Complaint.  Claim A is termed "Violation of Civil Rights" by Plaintiff.

Plaintiff asserts no specific cause of action and elucidates no legal standards under this claim

(neither in the Amended Complaint nor in the hundreds of pages Plaintiff has since filed in this

matter) – "[n]o single form of civil right violation describes this broad community racial action."

(Amended Complaint, Dkt. No. 51 at 8.)  Claim B is termed "Violation of Constitutional Rights"

by Plaintiff.  Neither does Plaintiff assert a specific cause of action and nor elucidate any legal

standards under this claim (neither in his Amended Complaint nor in the hundreds of pages he

has since filed in this matter).  (*Id.* at 8-9.)

However, the specific *factual allegations* Plaintiff makes do yield colorable *claims* for

*selective enforcement* and *failure to investigate* by the City.  The Court finds, for the reasons

explained below, that Defendant City of Lynden is entitled to judgment as a matter of law on any

claim or cause of action arising under Plaintiff's Claim A for Violation of Civil Rights and Claim

B for Violation of Constitutional Rights.

Claim C ("Libel and Slander, and Instigation of Hatred"), Claim D ("Harassment, Assault, Sabotage and Federal Hate Crime"), and Claim E ("Interference of Business Expectancy and Conflict of Interest") do not include any allegations against the City, nor do the facts pled by Plaintiff suggest that any of these claims apply to the City. (*Id.* at 9-10.) Plaintiff appears to concede in his Response to Defendant's Motion for Summary Judgment that he did not intend Claims C, D, and E to apply to the City. (*See* Dkt. No. 78 at 10.)

As a preliminary procedural matter, the Court strikes Plaintiff's Amended Response and all its attachments (Dkt. No. 83) for failure to comply with the Rules of Civil Procedure and the Local Rules of the Western District of Washington. Plaintiff has expressed dissatisfaction with the time given to prepare his Response. (*See* Response, Dkt. No. 78 at 1.) This dissatisfaction is inapposite – through the conjunction of several factors, Plaintiff received almost fifty additional days, above and beyond what the Local Rules require he be provided, to prepare his Response.[2]

---

[2] This Court's Order denying Plaintiff's Rule 56(d) request (Dkt. No. 76) directed Plaintiff to file his Response to Defendant's Motion for Summary Judgment by the Monday following entry of that Order, which was Monday, January 19th, 2015. Plaintiff filed an unrelated brief on Monday January 19th, 2015 (Dkt. No. 77), but did not file his Response (Dkt. No. 78) until the following day, Tuesday January 20th, 2015. Because our Order directing the filing of his Response by January 19th was entered on January 15, 2015, Plaintiff was given over four additional days after the denial of his Rule 56(d) Motion to complete his Response, four days more than he would have had otherwise, given that he filed his Rule 56(d) Motion on the day on which his Response to the Motion for Summary Judgment was originally due (December 1st, 2014, the Monday before the then-applicable noting date). Under these circumstances, Plaintiff could have been ordered to file his Response immediately subsequent to the Court's finding that his Rule 56(d) Motion had no merit. This would not have been unduly harsh, because the Court did not rule on Plaintiff's Rule 56(d) Motion for over a month after he filed it. Thus, Plaintiff had an interim *additional 45 days* to work on his Response to the Motion for Summary Judgment. However, the Court granted Plaintiff *yet further* time (those four additional days) to prepare his Response after our ruling on his Rule 56(d) Motion, despite the fact that this Motion was without merit. Despite these extensions, Plaintiff's Response to the Motion for Summary Judgment was a day late, giving Defendant one less day to prepare the Reply that was due the Friday after his Response was due. This is not the first time the Court has notified Plaintiff of the need for timely filing. (*See e.g.,* Dkt. No. 69.) *But, despite this history, we have given this untimely Response (Dkt. No. 78) consideration in the adjudication of this Motion. However, the Court*

1    **II.**     **DISCUSSION**

2       **A.**      **Summary Judgment Standard**

3        "Summary judgment is appropriate only if, taking the evidence and all reasonable

4 inferences drawn therefrom in the light most favorable to the non-moving party, there are no

5 genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

6 If, as to any given material fact, *evidence* produced by the moving party . . . conflicts with

7 *evidence* produced by the nonmoving party . . . , [the court] must assume the truth of the

8 evidence set forth by the nonmoving party with respect to that material fact." *Furnace v.*

9 *Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013) (emphasis added).  However, as the Supreme

10 Court has held, "[w]hen opposing parties tell two different stories, one of which is blatantly

11 contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

12 that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v.*

13 *Harris*, 550 U.S. 372, 380 (2007).

14       **B.**      **Selective Enforcement**

15        The first basis for Plaintiff's equal protection/ civil rights/ constitutional claims is that

16 "the City . . . inspected Plaintiff's building more frequently than . . . other buildings in the town."

17 (Amended Complaint, Dkt. No. 51 at 4.)  Plaintiff does not identify the specific cause of action

18 he wishes to invoke with this allegation or the elements of such a claim.  Given these voids, the

19

20

---

21 *must strike Plaintiff's* Amended *Response to the Motion for Summary Judgment (Dkt. No 83)*
*and its accompanying attachments.*  (This Amended Response is distinct from Plaintiff's Sur-

22 Reply (Dkt. No. 82), which the Court has considered.)  This Amended Response was filed on
January 29, 2015, *ten days after Plaintiff's Response was due and a week after the City filed its*

23 *Reply in support of its Summary Judgment Motion.*  To consider this Amended Response would
be to deny the right of the moving party to have the last word on their own motion, something

24 that may only be contemplated in extreme circumstances, such as when the moving party has
introduced new and nonresponsive matters into their reply brief.  Such is not the case here.  The

25 Court cannot grant leniency when doing so would impair the ends of justice and prejudice an
untimely party's opponents.  Hence, Plaintiff's Amended Response to Defendant's Motion for

26 Summary Judgment (Dkt. No. 83) is hereby **STRICKEN.**

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 5

Court has construed these particular allegations as pleading a claim for selective enforcement, as this is the equal protection cause of action most nearly implicated by the facts alleged by Plaintiff.

Selective enforcement occurs when the enforcement or prosecution of a law is "directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive" that the administration of the law amounts to a "practical denial of equal protection of the law." *United States v. Armstrong,* 517 U.S. 456, 464 (1996); *see also Yick Wo v. Hopkins,* 118 U.S. 356 (1886). To avoid liability for selective enforcement, public officers may not base their decisions to enforce laws against a person on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong,* 517 U.S. at 464; *see also Oyler v. Boles,* 368 U.S. 448 456 (1962). The constitutional prohibitions on selective enforcement apply not only to penal laws but also to the selective enforcement of civil ordinances. *See e.g., Snowden v. Hughes,* 321 U.S. 1 (1994).

However, it is the claimant's burden to prove selective enforcement – courts begin with the presumption that governmental actors have *not* violated equal protection. *United States v. Bennett,* 539 F.2d 45, 54 (10th Cir.), cert. denied 429 U.S. 925 (1976) (enforcement of the law is presumed to be undertaken in good faith).

In order to succeed on a selective enforcement claim, the claimant must show (1) disparate treatment (*i.e.* the failure to prosecute those similarly situated); and (2) improper motive for the prosecution/ intent (*e.g.* racial discrimination). *Wayte v. United States*, 470 U.S. 598, 607 (1985). Under the first prong, a showing that the complaining person was similarly situated to other persons is a prerequisite to the establishment of a prima facie case for selective enforcement. (*Id.* at 610.)

Even taking the evidence and drawing all inferences from this evidence in the light most favorable to Plaintiff, there are no genuine issues of material fact and the City of Lynden is entitled to judgment as a matter of law on the equal protection/ selective enforcement claim.

1    As a preliminary manner, there is absolutely no evidence, nor has Plaintiff even pled, that

2  the City selectively *enforced* its ordinances against Plaintiff.  Plaintiff merely pleads (but offers

3  no evidence creating a genuine dispute of this material fact) that his Dutch Village Mall was

4  *inspected* more frequently than other buildings.  He does not allege that these inspections were

5  followed by any stricter enforcement or penalties than were meted out to others similarly

6  situated.  *Indeed, all the evidence, including evidence submitted, acknowledged, or undisputed by*

7  *Plaintiff, seems to indicate that <u>the City did not enforce its ordinances against Mr. Lei when it</u>*

8  <u>*could have*</u>*, and never used any of the several penalties that the City could have invoked against*

9  *Mr. Lei for what appear to be numerous code violations*.  Perhaps the most illustrative incident

10 occurred in the context of the Lynden Fire Department's response to Mr. Lei's practice of

11 locking the Mall's exterior doors while patrons were still inside the Mall's theatre (which is

12 wooden and not up to current fire code standards).  As Gary Baar, Chief and Fire Marshal of the

13 City of Lynden Fire Department avers in his declaration:

14          [I]n July, 2012 . . . I learned that, during times when the theatre was in use, the
            front door of the building was being locked with people still inside.  Mr. Lei
15          was simply hanging the key nearby or having the Theatre have the key to
            unlock if needed, as a solution to the potential problem of people being
16          trapped inside [during a fire].  *This was a flagrant violation of the 2009 and/or*
            *2012 IBC, Section 1008.1.10, and also the type of violation that created a*
17          *huge risk of loss of human life, if they became trapped inside the theatre*
            *during a fire.  Once I became aware that the theatre was being locked, I had*
18          *the option to impose an immediate, or a 10-day, "fix or face closure" remedy.*
            *Instead, I sent him a letter explaining why he needed the panic hardware and*
19          *that it needed to be done within 30 days.  See Exhibit A, letter of July 25,*
            *2012, page #13.  I worked with Mr. Lei at great length.  He initially proposed*
20          *a cheaper type of "panic hardware" that he could install on the exterior door,*
            *to allow it to be locked to the outside, but not from the inside.  It was*
21          *inadequate as "panic hardware" according to me and the 2009 and/or 2012*
            *IBC.  I told him so, and suggested an alternative.  He did not want to use my*
22          *alternative, due to the cost.  Time was passing – months – and the theatre was*
            *remaining in use, despite the ongoing non-compliant door.*  Eventually, to
23          obtain compliance, I met with Mr. Lei at the building and told him he needed
            to get this taken care of now.  I am not sure if I gave him a time frame, but if it
24          was not taken care of soon, I would be taking other actions.  *This was about*
25          *three months after the first violation had come to my attention.  I still had not*

26

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 7

> *imposed any sort of economic sanction, nor was I threatening him in any way.*
> Ultimately, Mr. Lei did purchase the right hardware, and had someone install
> it. It was an acceptable, but not ideal fix, and since that was resolved, there
> have been no further issues with that door. *See* Exhibit A, Entry Log for
> November 8, 2012, page #14.

(Declaration of Gary Baar, Dkt. No. 56 at ¶¶14-15 (emphasis added).) The Fire Department was
not the only City organization that could have actually *enforced* City ordinances or assessed
noncompliance penalties against Plaintiff, but chose not to do so. According to Robert Jones, a
Building Official with over twenty years of experience and a certification from the International
Code Conference, and an employee of the Lynden Public Works Department, "there were
occasions when Public Works was aware of situations at plaintiff's property, where we as a
department could legally have been much more heavy-handed in enforcing city, state, and
federal codes against plaintiff." (Declaration of Robert Jones, Dkt. No. 58 at ¶4.) Mr. Jones
relates a representative incident in which the historic windmill atop Plaintiff's Mall self-severed
from the roof due to rot, broke through a railing, and fell onto the public sidewalk outside the
Mall, shortly before a City festival. The City "did not impose any sanctions, or try to restrict
[Plaintiff's] operations in any way, even as he was fixing the hazard." (*Id.*)

Plaintiff neither contradicts nor objects to any aspect of the above accounts. And
nowhere else in the briefing or his declarations does Plaintiff offer evidence, or even allege, that
the City imposed *any* penalties or fines on him. As it is undisputed that there has never been any
*enforcement* against Mr. Lei,[3] the City is entitled to judgment as a matter of law on these grounds
alone.

---

[3] For instance, Plaintiff does not refute Fire Chief Gary Baar's statement that "[t]here was never
one single occasion when I opted to use my enforcement powers against Mr. Lei." (Declaration
of Gary Baar, Dkt. No. 56 at 4.)

But *even if* Plaintiff had fulfilled this "step zero" of a selective enforcement claim and shown that *any* penalty or fine had been imposed, or established any question of law about the ability of selective *inspection* to establish an equal protection claim, he has nonetheless failed to establish to any issues of material fact with regard to the two prongs on which he has the burden of proof: disparate treatment compared to those similarly situated; and an improper, racially discriminatory motive.

    1)    First, with regard to *disparate treatment*, Plaintiff has failed either to raise any evidence creating a genuine dispute as to whether he was similarly situated to *any* other building operator *or* whether his building was inspected more than was warranted.

Plaintiff cannot demonstrate the presence of any genuine dispute as to whether anyone was similarly situated to him in his capacity as the owner and landlord of several tenant spaces in the Dutch Village Mall. Again, an equal protection claim (whether manifesting itself as a selective enforcement claim or otherwise) cannot stand unless the complaining person first establishes that he or she is similarly situated to other persons. *Wayte*, 470 U.S. at 610.

Plaintiff was the owner of the Dutch Village Mall, which Fire Chief Gary Baar describes as being "on [the City's] radar" for frequent inspections because:

> First, the Dutch Village Mall is a multi-story building, *constructed of wood,* adjacent to other downtown buildings, and it was built long enough ago that it is not currently up to existing fire code requirements. For that reason alone, it is an important place for frequent fire inspections. Second, there is a *hotel contained within* the Dutch Village Mall. Based on my training, education, and experience, a hotel is one of the highest priority locations for fire safety, because of the fact that people will presumably be sleeping there. A fire in a hotel would have the potential for massive loss of life. For that reason, too, frequent inspections are the norm. There is only one other hotel within the confines of the City of Lynden and it too is subject to frequent inspection. Third, the Dutch Village Mall contains *multiple "tenant" spaces,* which are routinely rented out to small businesses. Every time that a new tenant would apply for a business license from the City, that would trigger a routine-walk through inspection, based solely on the fact of

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 9

the new tenancy.  Finally, the Dutch Village Mall <u>*contains a theatre.*</u>  Just as the old idiom suggests, a "fire in a crowded theatre" has the potential for mass loss of human life.  Because the theatre occupies the Dutch Village Mall and the exit from the theatre is through the Mall, more frequent and thorough inspections are going to be the norm.

(Declaration of Gary Baar, Dkt. No. 56 at 3.)  The Dutch Village Mall also contains a commercial restaurant, with a grease trap mechanism that triggers Department of Public Works inspections.  (Declaration of Nick Imbery, Dkt. No. 57, 1-2.)  Plaintiff himself characterizes the Mall as "high profile."  (Plaintiff's Response, Dkt. No. 78 at 4.)

    Plaintiff claims (but does not support with evidence) that Lynden's YMCA building (which is made of wood), post office (which has many customers) and City Museum are similarly situated to the Dutch Village Mall and that the City never inspected any of these buildings for any purpose during the time that Plaintiff owned the Dutch Village Mall.  (Plaintiff's Response, Dkt. No. 78 at 9.)

    However, the City of Lynden has shown, and Plaintiff offers no evidence in refutation, that the YMCA building has been updated, is self-contained and would not light other buildings on fire were it to burn, has a single tenant, *and is owned by the City itself.*  (Defendant's Reply Brief, Dkt. No. 79 at 5; *see* Supp. Decl. of Smith, Dkt. No. 80, Ex. B, C, D.)  Defendant also has shown, and Plaintiff offers no evidence in refutation, that the Post Office is constructed of cement and brick, *and most importantly, that the Post Office is U.S. Federal Government property and not subject to City inspections and is exempt from City and State building codes.* (Defendant's Reply, Dkt. No. 79 at 5; Supp. Declaration of Jill Smith, Dkt. No. 80, Ex. C; Federal Management Regulation §102-80-85.)  Finally, Defendant has shown, and Plaintiff has offered no evidence in refutation, that the City Museum is a free-standing brick building, that it has a fire sprinkler system, that it is not occupied at night nor does it house a restaurant, theatre,

1   or multiple tenants, *and that it is owned by the City itself.*  (Defendant's Reply, Dkt. No. 79 at 6;

2   Supp. Declaration of Smith, Ex. D.)

3        Hence, there is no genuine issue as to whether there are any comparators to whom

4   Plaintiff is similarly situated.  There is no genuine dispute that the Mall's unique nature and

5   features distinguish it from the other buildings Plaintiff attempts to establish as comparators.

6   Thus, Defendant is entitled to judgment as a matter of law on this element alone.[4]

7        But even if these other buildings qualified as comparators, the City of Lynden has

8   established that the City buildings *were indeed inspected* during the period that Plaintiff owned

9   the Dutch Village Mall.  For instance, *the City inspected its own Museum thirteen times since*

10  *Plaintiff purchased the Dutch Village Mall.*  (Supp. Decl. of Smith, Ex. D.)  The City inspected

11  its own YMCA building twice during the time that Plaintiff was owner of the Dutch Village

12  Mall.  (Supp. Decl. of Smith, Ex. B.)  Plaintiff has presented no evidence refuting any of this.

13       And, Plaintiff has never alleged that any City inspection of the Mall was unwarranted.

14  According to Robert Jones, the City's Public Works Building Official:

15

16       Based on my training and experience, including my 5 years with the City of
         Lynden, the City did not subject Mr. Lei's building to undue levels of scrutiny.

17       To the contrary.  My opinion, after reviewing the records, is that Mr. Lei was not
         subjected to any "selective" or "discretionary" enforcement.  Instead, he received

18       only that level of inspection and enforcement that was necessary, either because it
         was on a scheduled rotation for inspection (i.e. the grease removal device serving

19       *his tenant's* restaurant), or because of an occurrence or complaint that triggered an

20

21

_____

22  [4] Further, the former owner of the Dutch Village Mall cannot function as a comparator to

23  Plaintiff/ is not similarly situated to him at the point that the inspections that occurred under the
    former owner's tenure occurred in an entirely different time period, *with several different*

24  *tenants, and under the aegis of different Fire Chiefs and Public Works Utility Technicians, who*
    *operated under different, unrevised codes.*  (*See e.g.,* Declaration of Gary Baar, Dkt. No. 56 at

25  ¶¶1, 5, 14; Declaration of Nick Imbery, Dkt. No. 57 at ¶10; Declaration of Robert Jones, Dkt.

26  No. 58 at ¶¶1, 3.)

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 11

1   interaction (overgrown trees).

2   (Declaration of Robert Jones, Dkt. No. 58, at ¶3.)

3         In sum, Plaintiff cannot establish any genuine disputes as to whether his building was

4   inspected more frequently than his particular and unique circumstances warranted.

5         2.    Second, Plaintiff presents no evidence establishing a genuine dispute as to

6   *discriminatory intent/ motive*.  Even if Plaintiff had been able to establish any genuine dispute

7   under the disparate treatment prong of selective enforcement, he would still need to establish

8   genuine issues of material fact under the second prong, with regard to improper discriminatory

9   purpose behind such disparate enforcement.  To establish this second prong of a selective

10  enforcement claim, a claimant must either produce actual evidence of racial animus on the part

11  of decision makers, or an indirect showing of the same.

12
13        Plaintiff has offered no evidence of direct or indirect racial animus on the part of City

14  officials.  His only attempts at doing so consist of alleging that "[i]n this case, [Defendants] are

15  like terrorists.  Plaintiff doesn't know where they are and who they are, but they are everywhere

16  repeatedly and relentlessly attacking him in the dark.  Even the local government seems

17  sympathetic with the terrorists."  (Plaintiff's Response to Defendant's Anti-SLAPP Motion, Dkt.

18  No. 24 at 9.)  At another point, Plaintiff concludes that "the violence resembles infamous small-

19  town lynching," (although he does not allege that he has ever been physically assaulted or that he

20  has been threatened with physical violence).  (Amended Complaint, Dkt. No. 51 at 8.)  Plaintiff

21  labels Lynden as rife with "senseless hatred" (*id.* at 1), a "violent community," (Plaintiff's

22  Objection to Defendants' Anti-SLAPP Motion, Dkt. No. 24 at 7) filled with "vigilantes" (*id*).

23
24  Finally, Plaintiff states that pre-investment research led him to conclude that Lynden was a

25  "small . . . very prejudice, redneck town," (Declaration of Jiangong Lei, Dkt. No. 78-1 at 2) in

26

which "virtually everyone is related to everyone" (Plaintiff's Response, Dkt. No. 78 at 4 fn.1 (citing www.urbandictionary.com)).

Such conclusory and inflammatory allegations are insufficient to establish any genuine dispute as to the discriminatory intent of City officials.

In sum, Plaintiff has failed to establish any genuine dispute of material fact on any of the elements of his equal protection claims pertaining to selective enforcement, and Defendant is entitled to judgment as a matter of law.  Such claims against the City of Lynden are dismissed with prejudice.

### C.    Failure to Investigate

The other basis for Plaintiff's equal protection/ civil rights/ constitutional law claims against the City is "law enforcement inaction."  (Amended Complaint, Dkt. No. 51 at 8.) Plaintiff alleges that the police did not conduct sufficient follow-up investigations of the several acts of low-level vandalism he reported as affecting Mall property during his ownership.[5] Plaintiff does not identify the cause of action he wishes to invoke with this allegation nor explain the elements of such a claim.  Given such absence, the Court has construed these particular allegations as pleading a claim for failure to investigate, as this is the cause of action most nearly implicated by the facts alleged by Plaintiff.

The City of Lynden is entitled to judgment as a matter of law on any equal protection or civil rights claim arising from Plaintiff's dissatisfaction with the way in which the Lynden Police Department dealt with his complaints.

As the City explains in its Motion for Summary Judgment, and Plaintiff does not dispute:

Even assuming there was a cause of action for "refusal to investigate," plaintiff

---

[5] "Police Department responded to phone calls from me or from tenants about the crimes against the building but none was investigated.  Most police reports also watered down the crimes." (Plaintiff's Response, Dkt. No. 78 at 6.)

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 13

1
2
3
4
5

would need to make a showing that the City's conduct was, in fact an intentionally "watered-down" response to his Complaints, compared to other such complaints, _and_ that the reason for the low-level response was racially motivated. Again, like above, he can make no such showing. The City sent officers to respond to every single report made by plaintiff. They documented each visit. Where there were leads to follow-up, they followed up. *See* Declaration of Chief Jack Foster, attached. Because the City did make a response to every single report, the burden should fall on plaintiff, to demonstrate through expert testimony, that the City's responses were somehow inadequate.

6

(Defendant's Motion for Summary Judgment, Dkt. No. 54 at 12.)

7
8
9
10

Although at this stage of the litigation, Plaintiff need not *prove* that the Police Department's responses to his vandalism claims were inadequate, to survive summary judgment Plaintiff must at least establish some genuine dispute of material fact with regard to these allegations. He has not.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

In his Response, Plaintiff's only rebuttal to the City's above argument is to allege, in a conclusory fashion, that "Police Department responded to phone calls from me or from tenants about the crimes against the building but none was investigated. Most police reports also watered down the crimes." (Plaintiff's Response, Dkt. No. 78 at 6.) In his Declaration in opposition to Defendant's Motion for Summary Judgment, Plaintiff provides a survey of the various acts of vandalism that caused him to call the police, as well as the reason for his dissatisfaction with each response. The alleged acts of vandalism about which Plaintiff called the police, and the reasons for his dissatisfaction with the response (in parentheses) include: a tenant's window was broken by a brick (officer apparently did not take the brick to dust for fingerprints, as Plaintiff desired him to do); arcade equipment was stolen (police allegedly did not mount an investigation into the suspect that Plaintiff suggested and also consolidated the report of this "attack" with the report about the broken window, as they occurred at the same time); someone turned off the decorative fountains at the Mall (the police allegedly did not include in their report Plaintiff's suspicions that this act of "sabotage" was perpetrated by a woman either envious of Plaintiff's koi fish or concerned for the fish's welfare); Plaintiff's report that a woman told him to "go back to your own f*cking country" (the police allegedly did not

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 14

1  write out the word "f*ck" in their police report and told Plaintiff that they could not file the

2  incident as a hate crime, as requested by Plaintiff, because there had been no physical attack, nor

3  crime); and finally, an unknown trespasser entered a tenant's restaurant to clean fish after hours

4  and then caused fish liquid to drip from a leaking garbage bag when the trespasser evidently took

5  out the trash (police allegedly "watered down" the report by stating that "an unknown person

6  used . . . restaurant to clean a fish").  (Declaration of Jiangong Lei, Dkt. No. 78-1 at 4-7.)

7       Never does Plaintiff allege that he called the police to report any act of vandalism or any

8  other crime without the police coming out and taking a report.

9       Even if all the above allegations were completely true, these facts would not be material

10 to or producing of any cause of action against the City.  Police Departments are given a great

11 deal of discretion in how they investigate complaints and the priorities they give to certain acts of

12 misconduct in the context of several competing duties.  None of the above, even taking

13 Plaintiff's *allegations* as true, would establish police misconduct.  Plaintiff does not dispute the

14 City's averment that the Police responded to each and every one of his calls, dispatched an

15 officer to make an investigation of the scene, and produced and filed a report on the alleged

16 vandalism.  Plaintiff has offered no evidence indicating that the police responses were less robust

17 than the police responses to other acts of vandalism at other commercial buildings in Lynden

18 during the time period in question.[6]  Police Chief Jack Foster avers, and Plaintiff does not refute,

19 _____

20 [6] Nor does Plaintiff offer evidence that his buildings were subject to more vandalism than

21 comparators.  As Lynden Police Chief Jack Foster avers and Plaintiff does not refute "[t]he rate
   at which Mr. Lei experienced low-level vandalism does not stand out, in any way, as more

22 frequent than similar buildings in other similar locations in Lynden.  In fact, the rate of low-level
   vandalism complaints, and the type of complaints, at the Dutch Village Mall, *prior to Lei's*

23 *purchase,* was also approximately once-per-year. . . They involved the same type of issues that
   Lei experienced – broken door locks or windows, theft, and/or criminal trespass.  Furthermore,

24 the rate of low-level vandalism continued to be about once per year after Mr. Lei sold the
   building in 2013. . . I have a high level of awareness, as to the criminal and quasi-criminal events

25 that happen in Lynden.  I have served in similar small towns.  Based on my many years of
   experience, I offer the following opinions: [Th]e level of vandalism that happened at the Dutch

26 Village Mall during plaintiff's ownership was neither more frequent, intense, or troubling, than

that Plaintiff "received the same level of investigation that any other reporting party would have received, given similar factual scenarios." (Declaration of Jack Foster, Dkt. No. 55 at ¶15.)  In his declaration, Chief Foster reviews the aforementioned acts of vandalism and explains that, in his "professional judgment as Chief of Police, the investigation[s] that occurred [were] all that [was] warranted." (*Id.* at ¶9.)  Chief Foster explains that with one exception, "there was absolutely nothing to suggest a racial motive" to the crimes or incidences and that "there were no leads . . . which would have been amenable to further investigation." (*Id.* at ¶10.)  The only exception to the general lack of racial animus was the situation in which a woman yelled at Plaintiff to go back to his "own f*cking country."  Chief Foster explains that with no physical attack, "this was not a crime, and there was little or nothing we could have done differently. . . We had no means to establish the identity of the suspect, because [Plaintiff] described her as a 'typical white female,' approximately age 45, of average height and 'chubby' weight." (*Id.* at ¶11.)  With regard to the after-hours trespass/fish cleaning/leaking garbage bag situation, Chief Foster reports that:

> Mr. Lei told me that he felt the incident to have been a hate crime because both he and the owners of the restaurant are of Asian descent.  I asked Mr. Lei if he had any evidence supporting this contention, such as the receipt of racially related hate mail . . . or any racially derogatory messages left at the scene, but he could provide none. . . Officer Glunt said he specifically had asked the restaurant

what occurs at many other downtown, visible locations.  Mr. Lei's property was actually more amenable to vandalism than other buildings, because of the many different entrance points (multiple shops with outside doors), and because it is on an alley that is not highly visible.  Given that fact, he had a remarkably low level of criminal and/or quasi criminal problems at the Mall during his ownership.  With the exception of the troubling but non-physical interaction with an unknown female, on August 20, 2012 [the woman who told Mr. Lei to return to his own country], nothing about the criminal activity at the Dutch Village Mall had any hint of racial animus.  There is simply no basis for me to conclude, based on my training and experience, that Lei or his property were being singled out for heightened levels of crime." (Declaration of Jack Foster, Dkt. No. 55 at ¶¶ 5, 6, 15.)  And even if Plaintiff had offered evidence indicating that similarly situated buildings did not suffer from comparable levels of vandalism, such would be irrelevant at the point that (a) the actions of private parties do not confer liability on the City, and (b) the City discharged its duties with regard to each of these acts of vandalism.

personnel if they could think of anyone who would have targeted them, either because of their race or for any other reason, but they could not think of anyone who would do so.  He also added that the owners did not seem to be overly concerned that this incident might have been some sort of harassment or that it may have been racially motivated.  Based upon the above, I believe this could be the episode about which Mr. Lei is alleging that hate crimes were ignored.  But in my judgment, there was simply no evidence that it was a "hate crime."  I am not aware of any complaints that specifically pertain to threats of violence or harm against Mr. Lei personally.  Given his willingness to call the Lynden Police Department for property crimes, I believe that he would have been able to access our services if he had truly been subjected to . . .[physical] "attacks."

(*Id.* at ¶¶13-14.)  Plaintiff does not refute any of the averments made in Jack Foster's declaration.  Thus, there are no genuine disputes of material fact with regard to the appropriateness, proportionality, or comparative vigor of the Lynden Police Department's responses to Plaintiff's calls.[7]  Defendant City of Lynden is entitled to judgment as a matter of law on any and all equal protection claims and civil rights claims stemming from what Plaintiff alleges to be the City's failure to investigate his reports of vandalism.

### D.     Other Tort Claims (Claims C-E)

Plaintiff's Amended Complaint also raises claims of "Libel and Slander, and Instigation of Hatred," (Claim C); "Harassment, Assault, Sabotage and Federal Hate Crime," (Claim D); and "Interference of Business Expectancy and Conflict of Interest," (Claim E).

Plaintiff makes no specific allegations with regard to the City and its liability for Claims C and D, thus, he has not shown there to be any dispute of material fact with regard to the City's liability for these claims.  This alone is sufficient grounds on which to dismiss the City from these claims.

With regard to Claim E, Plaintiff initially alleged in October 2014 that Defendant Gary

---

[7] Further, even had Plaintiff shown any misfeasance on the part of the Lynden Police, Plaintiff offers no *evidence* at all of discriminatory motive or intent.  His allegations on the topic are limited to those *general allegations* of discrimination detailed on pages 12 and 13 of this Order.  For the reasons these conclusory allegations failed to fulfill the intent prong of Plaintiff's selective enforcement claim, these allegations also fail to fulfill the intent prong of Plaintiff's failure to investigate claim.

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 17

1   Vis (the target of the Interference with Business Expectancy claim) was a City employee in his

2   capacity as Director of the Lynden Chamber of Commerce.  (*See* Amended Complaint, Dkt. No.

3   51.)  However, the Lynden Chamber of Commerce is *not* a City entity, but rather a private

4   organization.  Mike Martin, City Administrator for the City of Lynden avers that he has

5   "checked the City's payroll records from 2007 to date and [has] confirmed that Gary Vis was not

6   employed – nor is he employed – by the City in any capacity.  Gary Vis is the Executive Director

7   of the Lynden Chamber of Commerce.  The City contributes annually to the Chamber for the

8   work they do in setting up events like the Raspberry Festival, Farmer's Day, the Lighted

9   Christmas parade, etc., but they are a separate legal entity.  Gary Vis does not speak or act on

10  behalf of the City of Lynden."  (Declaration of Mike Martin, Dkt. No. 54, Ex. 1-B.)

11          In his Response, Plaintiff does nothing to refute this evidence, but instead makes the bare

12  conclusory allegation that "[t]here is a clear issue of material fact whether Mr. Vis is acting on

13  behalf of the City or the color or [sic] law."  (Plaintiff's Response, Dkt. No. 78 at 10.)  To the

14  contrary, *there is no genuine dispute* that Mr. Vis was not a City employee at the time relevant to

15  Plaintiff's claims.  Plaintiff offers no evidence in support of his claim that the City employed Mr.

16  Vis during this period, offers no refutation for Mr. Martin's averments, and gives the Court no

17  reason to believe that there is evidence that Plaintiff expects to discover that will show that Mr.

18  Vis is a City employee.  Thus, to whatever extent Claim E applies to the City, dismissal is

19  appropriate.

20          Additionally, *Plaintiff himself seems to acknowledge in his most recent filing with the*

21  *Court that Claims C-E do not apply to the City*.  In his Sur-Reply, he states "Claims C, D, and E .

22  . . are state tort claims not addressed to the City."  (Sur-Reply, Dkt. No. 82 at 3.)

23          Finally, even if these state-law based claims were addressed to the City, this Court would

24  dismiss them on summary judgment at the point that Plaintiff failed to comply with the

25  mandatory Notice of Claim requirements, as provided by RCW 4.96.020.

26          Thus, Claims C-E, in addition to Claims A and B, are dismissed as to the City of Lynden.

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 18

1    **III.    CONCLUSION**

2    　　　For the foregoing reasons, Defendant City of Lynden's Motion for Summary Judgment

3    (Dkt. No. 54) is GRANTED IN FULL.  Any and all claims against Defendant City of Lynden

4    and its various departments are hereby dismissed with prejudice.  Defendant City of Lynden and

5    its various departments are dismissed from this action with prejudice.

6    　　　DATED this 4th day of March 2015.

7

8

9

10

11

12                                                          John C. Coughenour
                                                           UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER GRANTING DEFENDANT CITY OF
LYNDEN'S MOTION FOR SUMMARY
JUDGMENT
PAGE - 19